**Manuel Cardenas GAMBOA, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 09–90–184 CR.**

Court of Appeals of Texas, Beaumont.

Jan. 8, 1992.

Rehearing Denied Jan. 27, 1992.

Discretionary Review Refused April 29, 1992.

Clyde W. Woody, Houston, for appellant.

Peter Speers, III, Dist. Atty., Kathleen Hamilton, Asst. Dist. Atty., Conroe for the State.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

## OPINION

WALKER, Chief Justice.

This is an appeal from a conviction for the third degree felony offense of Injury To A Child. A jury found appellant guilty and assessed his punishment at seven (7) years' confinement in the Institutional Division of the Texas Department of Criminal Justice. Appellant urges two points of error on appeal, *viz:*

Point of Error One: The appellant, Manuel Cardenas Gamboa, was denied effective assistance of counsel.

Point of Error Two: Submission of Parole Charge was fundamental error and deprived the appellant of a fair and impartial trial.

Appellant timely filed a Motion For New Trial and a hearing on the motion was held September 20, 1990. Appellant retained different counsel to prosecute his Motion For New Trial and subsequent appeal. The basis of appellant's Motion For New Trial was ineffective assistance of his trial counsel in that, during the trial, appellant's counsel was taking a prescription drug, "Prozac," which appellant claimed is well known for causing suicidal or aggressive behavior.

Appellant's trial counsel was the only witness in the motion hearing. He testified that a week or so prior to trial, a psychiatrist diagnosed him as "manic-depressive"

and prescribed the "Prozac." Trial counsel further testified that he had started taking the drug about four days prior to the start of appellant's trial. Trial counsel admitted that as a result of taking the drug, he felt very mellow and virtually non-aggressive. Trial counsel also stated that the drug caused his mind to be "fluffy," and that although he was still representing a few clients in non-complicated legal matters, he was abstaining from the practice of law. Trial counsel testified that he did not feel that he represented appellant effectively as a result of the effects of the drug. The trial court denied appellant's request for a new trial.

To support a claim of ineffective assistance of counsel, appellant must prove: 1) that counsel's performance was deficient and 2) this deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Boyd v. State*, 811 S.W.2d 105, 109 (Tex.Crim.App.1991); *Hernandez v. State*, 726 S.W.2d 53, 57 (Tex. Crim.App.1986). Absent both showings, we cannot conclude that a defendant's conviction resulted from a breakdown in the adversarial process that renders the result unreliable. *Strickland, supra* 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. Moreover, if a defendant fails to prove the prejudice component (the second prong), the Court need not address the question of counsel's performance. *Strickland, supra* 466 U.S. at 697, 104 S.Ct. at 2069, 80 L.Ed.2d at 699. The method for proving the prejudice component was spelled out as follows:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Strickland, supra* 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698.

In the instant case, appellant's counsel on appeal only cursorily touches on the prejudice factor in their appellate brief. Such conclusory statements as, "Due to the serious harm caused to Appellant as reflected in the length of sentence he received, counsel's actions in failing to protect Appellant cannot be considered sound trial strategy."; and, "Proper and timely objections were not made by defense counsel thereby placing the Appellant in the position of having waived his right to object on appeal to testimony and evidence admitted before the jury which was improperly admitted and which prejudiced and inflamed the jury against the Appellant herein.", do not suffice to show us that, even if such alleged conduct was found to be deficient, the results (either conviction or sentence) would have been different. In short, appellant's argument under his first point of error deals exclusively with the deficiency component of *Strickland* to the exclusion of the prejudice factor. The testimony elicited from appellant's trial counsel at the September 20, 1990 hearing is completely devoid of any proof of how his drug use and the resulting alleged deficiencies led to results that would have been different had the alleged deficient conduct not have occurred. Point of error one is overruled.

Point of error two avers that submission of a parole charge to the jury was fundamental error and deprived appellant of a fair and impartial trial. Under paragraph IV of the trial court's punishment instructions to the jury, the first sentence states:

> Under the law applicable in this case, the Defendant, if sentenced to a term of imprisonment, may earn time off the sentence imposed through the award of good conduct time.

Appellant's trial counsel timely objected to the specific wording of time off the "sentence." This objection was overruled by the trial court. Appellant's brief considers this to be "Rose" error and urges reversal on this point, "[i]n view of the fact that a jury in a felony case is not authorized to consider or apply the parole law in assessing punishment, argument urging them to do so is improper and constitutes reversible error."

The State correctly replies that because of an amendment to the Texas Constitution

effective November 7, 1989, the constitutional question answered by *Rose v. State*, 752 S.W.2d 529 (Tex.Crim.App.1987), with regard to parole instructions has been eliminated. *See, Johnson v. State*, 800 S.W.2d 563 (Tex.App.—Houston [14th Dist.] 1990, pet. ref'd). However, the State is incorrect in stating that the jury charge in the instant case properly tracked the language of TEX.CODE CRIM.PROC.ANN. art. 37.07, § 4(c) (Vernon Supp.1991). Under art. 37.07, § 4(c), the first sentence of the "parole" instruction should read:

> Under the law applicable in this case, the defendant, if sentenced to a term of imprisonment, may earn time off the *period of incarceration* imposed through the award of good conduct time. (emphasis ours).

With regard to the use of the word "sentence" instead of the statute's phrase "period of incarceration," *Rose* is applicable with regard to the following pronouncement:

> A prisoner may *not* "earn time off the sentence imposed." One may earn good time to eligibility for parole and mandatory supervision, but release on either status is subject to continuing compliance with rules and conditions of release "until the end of the term to which he was sentenced." Article 42.18, sec. 17; see also Article 6181–1, sec. 4, V.A.C.S.
>
> In oral argument the State characterized that language as "inartful." But if we are to presume that jurors follow instructions, as the Dallas Court insisted, *Rose v. State*, supra, at 836, then we must attribute to this jury an awareness at the outset that term of sentence imposed on appellant in accordance with number of years of punishment assessed by the jury in its verdict would be lessened by an award of good conduct time. Thus the jury begins its deliberations on punishment with an erroneous and misleading notion in mind. (emphasis theirs).

*Rose, supra* at 534.[1]

Because TEX. CONST. art. IV, § 11(a) has resolved the issue of the constitutionality of art. 37.07, § 4(c) by authorizing the trial court to inform juries about the effect of good conduct time and eligibility for parole, it is not error for a trial court to so instruct the jury. *See, Broussard v. State*, 809 S.W.2d 556 (Tex.App.—Dallas 1991, pet. ref'd). However, a resolution of the issue of constitutionality does not permit a trial court to erroneously inform a jury of the effect of parole and good conduct time. Based upon the brief but significant discussion of the wording of the art. 37.07, § 4(c) instruction from *Rose, supra*, we hold that the trial court erred in using the word "sentence" instead of the statutorily mandated phrase "period of incarceration."

Finding error in the jury charge, the focus of our analysis shifts to the inquiry prescribed by *Almanza v. State*, 686 S.W.2d 157 (Tex.Crim.App.1985) and its progeny. As stated by *Almanza*, if the error in the charge was the subject of a timely objection in the trial court, then reversal is required if the error is "calculated to injure the rights of defendant," which the Court of Criminal Appeals interpreted as meaning "no more than that there must be *some* harm to the accused from the error. *Almanza, supra* at 171. In other words, an error which has been properly preserved by objection will call for reversal as long as the error is not harmless. *Id.* The actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole. *Id.*

Admittedly, the harm analysis enunciated in *Almanza* permits an appellate court to review the entirety of a cold record ever conscious that reversal must result *unless* nothing in that cold record caused any harm to appellant in relation to the properly preserved error contained in the punishment instructions. In the instant case, we recognize at the outset that the record before us reflects a very hotly contested trial on two basic issues: did the complainant,

---

**1.** *See,* n. 6.

Kathy, sustain any injuries at all, and if so, could the appellant have been responsible for inflicting the injuries? *Both* sides in their respective cases-in-chief called "interested" family members as well as "disinterested" individuals who represented various levels of acquaintanceship to appellant and his immediate and extended families.

The witnesses for the State testified consistent with the State's theory of the case; that being that appellant was a violent man who mentally and physically abused his family, concentrating his abuse on the complainant, Kathy, to the point that the complainant was now a non-functioning, non-responsive human being. The State's "eyewitness" was appellant's eighteen year old step-daughter, Petra. While Petra testified that on the night in question she did not actually see appellant beat the complainant, Petra did testify that she heard appellant hitting the complainant and complainant yelling. Petra further testified that the beating lasted approximately five minutes and that she (Petra) did not intervene because of her fear of appellant. Petra testified that when complainant returned to the bedroom where Petra was doing her homework, the complainant showed Petra marks on her hands and legs. Petra characterized these marks as if complainant had been hit with a belt. Petra also testified that she had witnessed appellant beat the complainant with a shoe or a stick in the past. It is interesting to note that, although the State had introduced a series of fifteen photographs allegedly depicting marks on complainant's body inflicted during the beating, the record reflects that Petra, the only witness (other than appellant) who was present at the time of the beating, was not shown the photographs during direct or redirect examination.

Appellant took the stand in his own defense and denied his culpability as to the offense charged. He, as well as some nine other witnesses called in his behalf, testified to the loving and nurturing relationship between the complainant and himself. Appellant testified that he had never been convicted in this state or any other state, or under the laws of the federal government, of a crime greater than a traffic ticket. Appellant further testified that he had been employed by the same employer for roughly thirty-one years.

We candidly admit that after carefully examining the testimony of some twenty witnesses for both sides during the guilt/innocence portion of the trial, albeit an examination of a cold record, we can point to no evidence, single or collective, that overwhelmingly and without question points to appellant's culpability *or* innocence. As is their prerogative to do, the jury evidently satisfied any reasonable doubt as to appellant's guilt by considering the demeanor of the witnesses and a careful examination of the original photographs of the complainant's injuries.[2] All of this is to say that at this point in our *Almanza* analysis we have found nothing in the record that would cause our earlier holding of error in the punishment instructions to be deemed harmless. We now turn to the punishment phase of the trial.

The punishment phase testimony basically continued where the guilt/innocence phase testimony left off. Appellant's propensity for violence on complainant and her young brother, Rudy, was related by the State's sole punishment witness, appellant's wife, Alicia. During appellant's punishment evidence, appellant's character and general conduct toward young children were rehabilitated through the testimony of two non-family members as well as appellant himself. Appellant's trial counsel also qualified appellant for probation. Appellant's fourth punishment witness, a former Harris County jailer, testified that individuals incarcerated for child molestation or child abuse face danger from other inmates because child molesters and child abusers are at the bottom of the pecking order among the prison population. Again, from an examination of the cold record, we cannot say that appellant or the State elicited any testimony that could be considered a "knockout blow" to the other side, or an

---

**2.** We were not provided with the original photographic exhibits but were given very poor quality photocopies allegedly depicting complainant's injuries.

"absolute winner" for their respective positions. Their respective positions with regard to punishment, however, were very clear. Appellant was seeking probation from the jury and the State was seeking significant penitentiary time. This brings us to the closing arguments. True to form, the State argued for the maximum period of incarceration permitted by law for the offense involved, ten years; and appellant argued for probation. The basic reasons given by the State for requesting the maximum penitentiary time were: 1) to protect the complainant and the rest of complainant's family who have been living with appellant's abuse and violence long enough; and 2) to send a message to criminals generally, and to child abusers in particular, that such conduct will not be tolerated in Montgomery County.

■ Of great significance, we feel, is the following portion of the State's final argument to the jury. We take note of the fact that the State's closing argument is the last word the jury hears before deliberating an accused's fate. The pertinent portion is as follows:

Now, when you think about what sentence to assess Manuel Gamboa and you get to this parole charge, there's a paragraph in here that concerns me, because it says that under the applicable law, he will not become eligible for parole until the actual time served, plus any good conduct time earned, equals one-fourth of the sentence imposed. Don't interpret that to mean that he will serve one-fourth of the sentence you assess.

The final paragraph of the art. 37.07, § 4(c) instructions to the jury, which properly tracked the statutory language, contained the following:

You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant.

We find that the last sentence in the portion of the State's closing argument quoted above was improper as it distinctly directed the jury to consider how both the parole and good conduct rules might affect appellant with regard to the sentence the jury was to impose. There was no objection to this portion of the State's closing argument, nor was the jury instructed to disregard it. While such a remark may be of little or no consequence in the vast majority of criminal trials, under our interpretation of the *Almanza* standard of review, we cannot say that this remark, coupled with the erroneous wording in the same portion of the punishment instructions, rendered said erroneous wording harmless to appellant. The entire record presented to this Court was one of hotly contested issues, very sparse testimony as to the actual incident itself, a substantial amount of circumstantial evidence, and a great deal of probative testimony from one party's witnesses that was in sharp contrast to equally probative testimony from the other party's witnesses.

The fact that appellant was eligible for probation, which is obviously the low end of the punishment spectrum; that the maximum amount of incarceration the jury was authorized to assess was ten (10) years; and that the jury returned a verdict of seven (7) years' confinement in the penitentiary, which is on the high end of the punishment spectrum, further leads us to conclude that the charging error resulted in some harm to appellant. Point of error two is sustained.

Having found reversible error solely in the punishment phase of appellant's trial, TEX.CODE CRIM.PROC.ANN. art. 44.29 (Vernon Supp.1991), requires the cause to be remanded for a new punishment hearing only. Therefore, we affirm in part the judgment of the trial court insofar as appellant's guilt is concerned, but reverse and remand in part concerning appellant's punishment.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.