Billy Bandrate TAYLOR, Appellant,

v.

The STATE of Texas, Appellee.

No. 06–03–00166–CR.

Court of Appeals of Texas, Texarkana.

Submitted Sept. 29, 2004.

Decided Oct. 13, 2004.

Craig L. Henry, M. Mark Lesher, Texarkana, for appellant.

Deborah Moore, Red River Asst. County Atty., Val Varley, County and Dist. Atty., Clarksville, for appellee.

Before MORRISS, C.J., ROSS and CARTER, JJ.

## OPINION

Opinion by Justice CARTER.

A jury found Billy Bandrate Taylor ("Billy") guilty of murdering Richard Craddock ("Ricky") [1] in the parking lot of Clarksville's Quicky Superette by shooting him multiple times with a firearm. In assessing punishment, the jury found Billy was not under the immediate influence of sudden passion arising from adequate cause during the time of the offense. *See* TEX. PEN.CODE ANN. § 19.02(a)(2), (d) (Vernon 2003). The jury then assessed Billy's punishment at life imprisonment.

On appeal, Billy asserts, and the State concedes, that during punishment, the trial court erroneously instructed the jury about the operation of parole. The sole issue on appeal is whether the trial court's erroneous instruction presents reversible error. To answer that question, we must first decide whether Billy preserved the error at trial, a matter on which the parties do not agree. We then consider

whether Billy has shown the requisite degree of harm to require this Court to reverse his sentence for a new punishment trial.

## I. Reviewing Alleged Error in the Jury Charge

The purpose of a jury charge is to instruct the jury on applying the law to the facts of the case. *Abdnor v. State,* 871 S.W.2d 726, 731 (Tex.Crim.App.1994). If appellate review of the jury charge reveals the trial court did not properly instruct the jury on the law applicable to the case, then doubt is cast on the integrity of the verdict. *Id.* An erroneous or incomplete jury charge does not, however, result in automatic reversal of the conviction or punishment. *Id.* Instead, the appellate court "must determine whether sufficient harm resulted from the error to require reversal." *Id.* at 731–32 (citing *Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Crim.App. 1984) (op. on reh'g); and referencing *Gibson v. State,* 726 S.W.2d 129, 132 (Tex. Crim.App.1987)).

On appeal, the level of harm an appellant must demonstrate as having resulted from the erroneous jury instruction depends on whether the appellant properly objected to the error at trial. *Abdnor,* 871 S.W.2d at 732. If the appellant properly objected at trial, the appellant need only demonstrate "some harm" on appeal. *Id.; see also Almanza,* 686 S.W.2d at 171. If, however, the appellant did not properly object to the error at trial, then the appellant must demonstrate that "egregious harm" resulted from the erroneous instruction. *Abdnor,* 871 S.W.2d at 732 (citing *Arline v. State,* 721 S.W.2d 348, 351 (Tex.Crim.App.1986); *Almanza,* 686 S.W.2d at 171). "Egregious harm consists of errors affecting the very basis of the

1. Several witnesses share the complainant's and the appellant's last names. To avoid confusion for the reader, we refer to most of the people involved by their first names.

case or that deprive the defendant of a valuable right, vitally affect a defensive theory, or make the case for conviction or punishment clearly and significantly more persuasive." *Blumenstetter v. State*, 135 S.W.3d 234, 240 (Tex.App.-Texarkana 2004, no pet.). In either case, the degree of harm shown by the appellant must be actual, not merely theoretical. *Almanza*, 686 S.W.2d at 174; *Blumenstetter*, 135 S.W.3d at 240.

## II. The Trial Court's Parole Instruction and the Requirements of Article 37.07

■ As part of its charge to the jury during the punishment phase of the trial, the trial court gave the following instruction regarding parole:

> Under the law applicable in this case, the defendant, if sentenced to a term of imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.
>
> It is also possible that the length of time for which the defendant will be imprisoned might be reduced by the award of parole.
>
> *Under the applicable law in this case, if the defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served plus any good conduct time earned equals one-half of the sentence imposed or 30 years, whichever is less, without consideration of any good conduct time he may earn. If the defendant is sentenced to a term of less than*

> *four years he must serve at least two years before he is eligible for parole. Eligibility for parole does not guarantee that parole will be granted.*
>
> It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities.
>
> You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant.

(Emphasis added.) The italicized language in the trial court's jury charge is incorrect because the jury had previously found Billy guilty of murder, a "3g" offense. *See* Tex.Code Crim. Proc. Ann. art. 37.07, § 4 (Vernon Supp.2004–2005); *see also* Tex.Code Crim. Proc. Ann. art. 42.12, § 3g(a)(1)(A) (Vernon Supp.2004–2005) (murder is Section 3g offense). If the defendant has been found guilty of an offense listed in Article 42.12, Section 3g(a)(1) of the Texas Code of Criminal Procedure, or if the jury finds the defendant used or exhibited a deadly weapon during the commission of a crime, the Texas Legislature has mandated that the following language be made a part of the jury's charge on punishment:

> Under the law applicable in this case, the defendant, if sentenced to a term of imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts at

rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.

It is also possible that the length of time for which the defendant will be imprisoned might be reduced by the award of parole.

*Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served equals one-half of the sentence imposed or 30 years, whichever is less, without consideration of any good conduct time he may earn. If the defendant is sentenced to a term of less than four years, he must serve at least two years before he is eligible for parole. Eligibility for parole does not guarantee that parole will be granted.*

It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities.

You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant.

TEX.CODE CRIM. PROC. ANN. art. 37.07, § 4(a) (emphasis added); *see also* TEX.CODE CRIM. PROC. ANN. art. 37.07, § 4 (Vernon Supp. 2004–2005), art. 42.12, § 3g(a)(1)(A); TEX. GOV'T CODE ANN. § 508.145(d) (Vernon Supp.2004–2005); *Coleman v. State,*145 S.W.3d 649, 651–523 (Tex.Crim.App. 2004).

When we compare the charge given by the trial court with the charge required by statute, two significant flaws become apparent. First, the trial court deviated from the required statutory language by erroneously inserting the phrase "plus any good conduct time earned" into the parole instruction. As has been previously stated, someone convicted of murder in Texas is not permitted to count any earned "good conduct time" toward parole eligibility. TEX. GOV'T CODE ANN. § 508.145(d). To the extent that the trial court's instruction suggests differently and is not the proper, statutorily required charge, the instruction is a misstatement of the applicable law.

Second, the trial court's use of the phrase "plus good conduct time earned" is internally inconsistent with the subsequent appositive phrase "without consideration of good conduct time he may earn," which modifies the statute's explanation of parole eligibility. The former phrase ("plus good conduct time earned") suggests good conduct time will be added to the actual time served by Billy to determine his parole eligibility. The latter wording, however, directly contradicts such a suggestion because it expressly states Billy's parole eligibility will not be determined by including any good conduct time earned. In light of these flaws, the instruction is patently erroneous. We must now determine whether Billy properly objected at the trial court level.

### III. Billy's Omnibus Proposed Charge and Error Preservation

After receiving all the evidence during punishment, the trial court allowed both sides to make objections to the proposed jury instructions. Billy's counsel filed proposed instructions, which he described as "a complete punishment charge." The record shows counsel's proposed charge was copied from a book of pattern jury instructions. Counsel's proposed charge did, however, contain a correct version of the required parole instruction, but that instruction was buried amidst six pages of

other varied instructions. The trial court denied counsel's proposed "complete punishment charge," and Billy did not present any other specific, oral, or written objections to the trial court's instructions on the operation of parole. And he requested no other specific instructions.

In *Arana v. State*, 1 S.W.3d 824, 826–28 (Tex.App.-Houston [14th Dist.] 1999, pet. ref'd), the Fourteenth Court of Appeals considered whether an eight-page proposed series of instructions properly preserved error in the jury charge. The trial court denied Arana's omnibus charge, but (before submitting its proposed charge to the jury) gave Arana the opportunity to voice specific objections to any portion of the charge he found objectionable. Arana made several objections, none of which related to the erroneous instructions at issue on appeal. *Id.* at 827.

The Fourteenth Court reviewed the purpose of TEX.CODE CRIM. PROC. ANN. art. 36.15 (Vernon Supp.2004–2005), and concluded its purpose was not to enable a defendant to preserve error in the jury instructions merely by submitting an omnibus criminal charge. The *Arana* court reasoned that "much of it will likely not be substantively different from the court's version or disputed, and the portions which do differ substantively are not readily distinguishable from those which do not." *Id.* at 828.

Therefore, where [A]rticle 36.15 provides that requested instructions will not be deemed waived when the trial court revises a charge without responding to them, we believe this pertains to specific provisions which the defendant presents in a manner that fairly apprises the trial court that the defendant is proposing something different from or in addition to that which is under consideration. *Id.*

■ We agree with the analysis in *Arana* and adopt its reasoning. When apply-ing *Arana's* interpretation of Article 36.15 to the case now on appeal, the record before us clearly shows the trial court was not made specifically aware of the erroneous parole instruction through a specific request or objection from either side. Thus, Billy's submission of an omnibus charge, without more, cannot be seen as a sufficient, specific request pursuant to Article 36.15. Accordingly, we find Billy failed to properly object to the error in the trial court's parole instruction and, as a result, Billy must demonstrate that he suffered "egregious harm" on appeal to warrant reversal for a new punishment hearing. *See Abdnor*, 871 S.W.2d at 732; *Almanza*, 686 S.W.2d at 171.

## IV. A Review of Recent Decisions

In their briefs to this Court, and again during oral argument, the parties focused on three cases each believed should guide us in determining whether Billy suffered "egregious harm." Those cases are *Guillory v. State*, 956 S.W.2d 135 (Tex.App.-Beaumont 1997, no pet.); *Shavers v. State*, 985 S.W.2d 284 (Tex.App.-Beaumont 1999, pet. ref'd); and *Hill v. State*, 30 S.W.3d 505 (Tex.App.-Texarkana 2000, no pet.). We also find instructive the Texas Court of Criminal Appeals' recent decision in *Ross v. State*, 133 S.W.3d 618 (Tex.Crim.App. 2004).

### A. *Guillory v. State*

A jury convicted Guillory of sexual assault and assessed his punishment at forty-three years' imprisonment. *Guillory*, 956 S.W.2d at 136. On appeal, he asked for reversal of his punishment due to an improper parole instruction. *Id.* The trial court's instruction had erroneously informed the jury that the "sentence" imposed—instead of the statutorily required "term of incarceration imposed"—could be

reduced by the award of good conduct time. *Id.* at 137. At trial, Guillory had not objected to the charge error. *Id.*

The Beaumont Court of Appeals held the instruction was erroneous, but further held Guillory did not suffer egregious harm as a result. The charge did not create reversible error because the jury had received curative and mitigating instructions, which the court of appeals presumed were followed by the jury in the absence of any record evidence to the contrary. *Id.* at 137–38. The *Guillory* court further noted that the appellant had received a punishment of forty-three years' imprisonment (which was midway in the possible punishment range), even though the State had asked for sixty years and the appellant had asked for twenty-five. *Id.* Finally, the Beaumont court noted neither side had commented on Guillory's parole eligibility during any part of the trial. *Id.* at 138. Accordingly, the court concluded Guillory did not suffer egregious harm as a result of the erroneous parole instruction.

**B. *Shavers v. State***

In *Shavers*, a jury found the appellant guilty of murder and assessed his punishment at imprisonment for eighty years. *Shavers*, 985 S.W.2d at 286. In its punishment charge, the trial court had told the jury that Shavers would be eligible for parole when his actual time served, *plus his good conduct time,* equaled one half of the sentence imposed or thirty years, whichever was less. *Id.* at 292. Shavers had not objected to the erroneous instruction at the trial court level. *Id.* at 291.

On appeal, the Beaumont Court of Appeals wrote,

> [t]he misstatement of the law in the charge, in effect, tells the jury that the

defendant may be eligible for parole at an earlier date because of good conduct time. One possible result of such an instruction is a jury's assessment of a longer sentence in an attempt to offset the effect of good conduct time. In addition to the offending instruction, however, the charge also contains other instructions which [sic] have been regarded by this court and others as curative and mitigating factors to consider when determining whether the erroneous instruction caused harm to a defendant.

*Id.* at 292. The court then reviewed the presumption that the jury followed the trial court's instruction that it could not consider how parole and good conduct time might be applied to Shavers and concluded, "Absent indications to the contrary, this presumption prevails." *Id.*

The *Shavers* court also noted other factors mitigating against a finding of egregious harm: (1) there was no evidence the jury was confused about the charge; (2) no motion for new trial was filed; (3) nothing in the record suggested the jury considered or tried to apply good conduct time or the parole law in assessing Shavers' punishment; (4) no comments were made during either the State or the appellant's closing argument concerning parole, parole eligibility, or the effect of good conduct time on parole; the evidence adduced at trial supported a finding of guilt; and the jury assessed punishment at less than the maximum allowed under law. *Id.*

**C. *Hill v. State***

In *Hill,* we reviewed a jury charge that failed to strictly comply with Article 37.07. *Hill,* 30 S.W.3d at 507.[2] The trial court

---

**2.** Hill pled guilty to aggravated robbery, and the jury assessed punishment at thirty years' imprisonment and a $5,000.00 fine. *Hill,* 30 S.W.3d at 506. Because Hill had committed a "3g" offense, the date of his parole eligibility was not calculated by including any good conduct time he may earn during his imprisonment. *See* Tex.Code Crim. Proc. Ann. art.

had not included the phrase "without consideration of any good conduct time he may earn" in its instruction on when Hill might be eligible for parole. Instead, the trial court instructed that, if Hill was sentenced to a term of imprisonment, he would become eligible for parole when his actual time served "plus good conduct time equal[ed] one-half of the sentence imposed or thirty (30) years, whichever [wa]s less." *Id.* Like the appellants in *Shavers* and *Guillory,* Hill had not objected to the error in the trial court. *Id.*

On appeal, Hill claimed the trial court's submission of an erroneous jury charge caused egregious harm. *Id.* at 506–07. We agreed. In reversing Hill's sentence, we noted that "the jury had no choice but to believe under the existing law it [was] possible for the defendant to become eligible for parole when 'the actual time served plus good conduct time equals one-half of the sentence imposed or thirty (30) years, whichever is less.' " *Id.* at 508. "The [trial] court's misstatement of the law in this case misled the jury and seriously affected how it viewed the existence of parole and good conduct time, which the instructions plainly told the jury it could consider." *Id.* We then distinguished our holding from that of the Beaumont Court of Appeals in *Shavers.*

In *Shavers,* the Beaumont court held that "[t]he misstatement of law in the charge, in effect, tells the jury that the defendant may be eligible for parole at an earlier date because of good conduct time," but that this error did not result in a showing of egregious harm because of certain mitigating factors, including a curative instruction, which told the jury

that it was not to consider how good conduct time or parole would affect this particular defendant.

*Id.* (footnote omitted). We disagreed with the Beaumont court's "narrow characterization of how this charge error misinform[ed] the jury." *Id.* The misstatement regarding parole law "clearly affect[ed] not only the jury's idea of when this particular defendant [wa]s eligible for parole, but it also misle[d] the jury about the general existence of the parole laws and good conduct time." *Id.* at 508–09. We concluded that "the misstatement about the parole system itself cannot and [was] not cured by [the mitigating] instruction." *Id.* at 509.

### D. *Ross v. State*

In *Ross,* the Texas Court of Criminal Appeals reviewed a capital murder conviction involving an erroneous jury instruction regarding the accused's parole eligibility. The trial court was required by statute to submit the following instruction in Ross' death penalty case:

Under the law applicable in this case, if the defendant is sentenced to imprisonment in the institutional division of the Texas Department of Criminal Justice for life, the defendant will become eligible for release on parole, but not until the actual time served by the defendant equals 40 years, without consideration of any good conduct time. It cannot accurately be predicted how the parole laws might be applied to this defendant if the defendant is sentenced to a term of imprisonment for life because the application of those laws will depend on

42.12, § 3g(a)(1)(F) (Vernon Supp.2004–2005); TEX. GOV'T CODE ANN. § 508.145(d). The evidence showed that Hill also committed two other aggravated robberies on the day in question, that he was eighteen years old at the time of the robberies, that he had been in

juvenile detention since age fifteen, and that he had been on release from the Texas Youth Commission for only four months before committing the crime for which he was then on trial. *Hill,* 30 S.W.3d at 507.

decisions made by prison and parole authorities, but eligibility for parole does not guarantee that parole will be granted.

*Ross,* 133 S.W.3d at 622 (referencing TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(e)(2)(B) (Vernon Supp.2004–2005)). The jury was, however, instructed:

> Under the law applicable in this case, the defendant, **if sentenced to a term of life imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.**
>
> It is also possible that the length of time for which the defendant will be imprisoned on a life sentence might be reduced by the award of parole.
>
> Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment in the Institutional Division of the Texas Department of Criminal Justice for life, he will not become eligible for parole until the actual calendar time served without consideration of good conduct time, equals forty calendar years. Eligibility for parole does not guarantee that parole will be granted. It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a term of imprisonment for life, because the application of these laws will depend on decisions made by prison and parole authorities.
>
> **You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded or forfeited by this particular defendant.**

*Id.* at 622–23 (footnotes omitted) (emphasis in original).

The State conceded, and the Texas Court of Criminal Appeals agreed, that the trial court's instruction had been erroneous because it did not strictly comply with Article 37.071, Section 2(e)(2)(B) of the Texas Code of Criminal Procedure. *Id.* at 623. None of the instructions in the first and last paragraphs were authorized by the statute. Ross had objected to the erroneous instruction at the trial court level. The standard of review, therefore, required Ross to show only "some harm" on appeal. The Texas Court of Criminal Appeals, however, held Ross was not harmed by the error. *Id.* at 624.

That court based its decision on five considerations: (1) the parole charge informed the jury that a life-sentenced appellant "may" be released from prison after forty years, not that he necessarily would; (2) the jury was instructed not to consider how good conduct time might be applied to Ross, and there was no evidence in the record the jury did not follow that instruction; (3) there was nothing in the record suggesting the jury considered, discussed, or attempted to apply what it was told about parole and good conduct time (in violation of the trial court's instruction not to consider such issues); (4) the jury sent out no notes indicating or expressing confusion about the possible application of good conduct time to appellant; and (5) during closing argument, appellant's counsel told the jury that a life-sentenced Ross would not be eligible for parole until he had served at least forty years in prison, and that claim was not contradicted by the State. *Id.* at 624. Thus, the Texas Court of Criminal Appeals concluded Ross suf-

fered "no harm from the erroneous jury charge." *Id.*

## V. Does the Record Support Billy's Claim of Suffering Egregious Harm?

█ With these cases in mind, we now turn to the facts of this case to determine whether Billy has demonstrated "egregious harm" as a result of the erroneous parole charge. To make this determination, we must examine "the entire jury charge, the state of the evidence (including contested issues and the weight of the probative evidence), the argument of counsel, and any other relevant information revealed by the record as a whole." *Stokes v. State,* 74 S.W.3d 48, 50 (Tex. App.-Texarkana 2002, pet. ref'd); *see Almanza,* 686 S.W.2d at 171.

### A. The Charge

█ Under Article 37.07, Section 4(a), a jury should be instructed that it may not consider the manner in which the parole law may be applied to a specific defendant. The jury in this case was so instructed. The jury was also admonished to not consider the extent to which Billy might earn or might forfeit any good conduct time.

█ "It is presumed a jury follows and understands a court's charge unless there is evidence to the contrary." *Stokes,* 74 S.W.3d at 51 (citing *Hutch v. State,* 922 S.W.2d 166, 172 (Tex.Crim.App.1996)). The charge instructed the jury not to consider among themselves how long Billy might actually serve in prison. The jury did not send any notes to the trial court regarding parole or its effect on Billy's length of incarceration. There is no testimony from a hearing on the motion for new trial regarding juror misconduct. And there is nothing else in the record to indicate the jury failed to heed the trial court's admonition against considering how the operation of parole might apply to

Billy's term of actual imprisonment. *Cf. Shavers,* 985 S.W.2d at 292.

### B. The State of the Evidence

The evidence of Billy's guilt was strong in this case. Eyewitnesses testified that Billy killed Ricky. Others told the jury that the complainant and the victim had been at odds recently because both men had maintained affairs with the other's wife or girlfriend.

#### 1. Stacy Scott

Stacy Scott ("Stacy") was at the Quicky Superette on the night of Ricky's murder. When Stacy arrived at the store, he saw Billy, Billy's sister, and Billy's mother (Hattie Taylor). Ricky arrived shortly thereafter. Billy and Ricky were both inside the store at some point; Billy was the first to come out, and he went to his car. Ricky later exited and walked toward Stacy's car.

Suddenly, a commotion erupted. Stacy heard Billy's mother say, "Don't do it. Don't do it." At this point, Stacy observed Billy holding a gun. Several people tried to restrain Billy, but he broke free and started shooting Ricky. Some of the shots hit Stacy's car: one bullet broke the back window of Stacy's car; another bullet hit the bottom part of Stacy's seat belt. After the shooting stopped, Stacy exited his vehicle and checked on Ricky's condition.

According to Stacy's testimony, Billy then approached the wounded Ricky and started kicking him and calling him names. Through cross-examination, Billy's counsel tried to suggest Billy's actions were the result of self-defense, but Stacy disagreed with that claim. Stacy also testified that he never saw Ricky with a weapon of any kind.

On further cross-examination, Stacy admitted knowing that a problem existed between Billy and Ricky because Ricky

was having an affair with Geanette Taylor (Billy's wife). Stacy also told the jury that he later discovered Ricky, not Billy, was the father of Geanette's unborn child. This testimony, if believed by the jury, provided a strong motive for Billy to kill Ricky.

## 2. Darlece Baird

Darlece Baird was working at the Quicky Superette on the night of Ricky's murder. Around 9:15 p.m., she heard a commotion, looked outside, saw someone pointing a gun downward, and then observed the gun being fired. The store's surveillance camera filmed the incident, and a videotape of the incident was admitted into evidence and played for the jury.

## 3. James Thomas

James Thomas ("James") was at the Quicky Superette that same night. James exited the store around 9:15 p.m. and went to talk to Stacy. While James was talking to Stacy, he noticed a man in a red shirt (later identified as Ricky) exit the store. Ricky approached Stacy and James. James said goodbye to Stacy and walked off, but later looked back at Stacy. James then saw Stacy's "eyes g[e]t real big." James saw a third man with a gun, who fired the gun at Ricky several times.

James then ran to the safety of his own truck. Once the shooting stopped, he looked up and saw that a woman had grabbed the shooter, and the two were wrestling over the gun. The shooter eventually broke free and resumed firing. After the second round of shooting stopped, James saw the shooter (who James identified as Billy) walk toward where Ricky lay. James then saw Billy make a motion that suggested Billy was kicking the wounded man. James then left the scene for fear the shooting might resume.

## 4. Officer Brandon Harbison

Brandon Harbison ("Harbison"), an officer with the Clarksville Police Department, was dispatched to the Quicky Superette in response to shots being fired. After arriving, Harbison questioned Billy, and Billy admitted he had killed Ricky. Later, Harbison and a team of other officers recovered from the parking lot ten spent cartridges and one live round, all of which were introduced into evidence.

The ballistic and forensic evidence was introduced at trial for several reasons: (1) to show the number of times Billy shot Ricky, (2) to show the danger to which bystanders were exposed when Billy's stray shots went into other vehicles, and (3) to dissuade the jury that Billy had fired merely in self-defense.

## 5. Mary Amos

Mary Amos ("Mary") testified Billy was at the scene of Ricky's murder. Shortly after the shooting, Mary saw Billy "[p]acing back and forth" at the crime scene. She asked Billy why he had killed Ricky, and Billy replied, "So? So? I told that n[—] I was gonna get him. So?"

Mary also told the jury she heard Billy's mother, Mattie Taylor (who was also at the scene), say, "Billy did it. I told him not to do it. I told him not to." [3]

## 6. Geanette Taylor

Geanette Taylor ("Geanette") was married to Billy at the time of the murder, but divorced him shortly before trial. She testified that Billy had assaulted her on several occasions and that he had many times threatened to shoot both her and Ricky. Geanette also told the jury that Billy had once threatened her with a gun.

## 7. Marla Taylor

Marla Taylor ("Marla") is Billy's sister. According to her testimony, earlier in the

---

**3.** Billy did not object to Mary's testimony as hearsay.

evening on the night of Ricky's death, Marla asked Billy to come to her house to kill a snake. Billy brought his gun when he came, but they were unable to locate the snake. Later, Billy left Marla's house and went to the Quicky Superette to get something to eat. Marla subsequently heard the gunshots coming from the direction of the nearby store. Marla went to the store, found her mother, and asked what had happened. Marla and Billy's mother told Marla that Billy had shot Ricky.

### 8. Billy Taylor

Billy admitted to the jury that he was carrying a gun on the night of August 22. He also admitted shooting Ricky, but claimed he did so in self-defense.

According to his testimony, he had left his sister's house and went to the Quicky Superette to get something. While he went inside the store, he left his gun on the front seat of the car. As he exited the store, he saw Ricky walk into the store. The two did not speak, and Billy left. Billy later saw Ricky exit the store and go toward Stacy's car. Then, at some point, Billy saw Ricky with something in his hand and saw that Ricky was coming toward him. So Billy reached down into the seat of his car, grabbed his gun, shot Ricky, and then ran. By its verdict, the jury obviously disagreed that Billy had killed Ricky merely in self-defense.

### 9. The Autopsy

The autopsy report showed Ricky died from multiple gunshot wounds. The coroner concluded the cause of death was homicide. The first and second gunshots perforated Ricky's diaphragm, the left lung, the stomach, the liver, the mesentery, the posterior left rib, and then traveled into the right abdominal region. The third gunshot entered through Ricky's midback. That bullet severed Ricky's spi-

nal cord, hit his diaphragm, and damaged his heart and sternum.

### C. The Argument of Counsel

During closing arguments, neither party referenced the erroneous parole instruction. Instead, the State focused first on dissuading the jury from finding Billy acted under "sudden passion." The State then asked the jury to sentence Billy to imprisonment for life as payment for the life he had taken. Finally, the State asked the jury to deny Billy's request for community supervision because "[community supervision] is for non-violent offenders" and because community supervision would do little to deter future murderers from killing others. Cf. Gamboa v. State, 822 S.W.2d 328, 332–33 (Tex.App.-Beaumont 1992, pet. ref'd) (State's opening argument on punishment asked for maximum imprisonment to protect victim and send a message to criminals generally).

Conversely, Billy's counsel asked the jury first to make an affirmative finding that Billy had acted under "sudden passion" when he killed Ricky. Counsel then asked the jury to consider granting community supervision. Cf. id. (defendant asked for community supervision).

### D. Does the Record Show Egregious Harm?

The facts of this case are similar to those we reviewed in Hill, 30 S.W.3d 505. In Hill, the jury was improperly instructed that the defendant would be eligible for parole when actual time served plus good conduct time equals one half the sentence or thirty years, whichever was less. Here, a similar instruction was given to the jury but the instruction also contained, in the same sentence, a statement that parole would be calculated "without consideration of any good conduct time." To that extent, there is a distinction between this case and Hill. Since Hill, the Texas Court of Criminal Appeals has issued its decision

in *Ross*, 133 S.W.3d 618. The appellant in *Ross* had objected to the erroneous jury instruction containing two paragraphs of improper instructions regarding "good conduct time." The standard of review, therefore, required the appellant to demonstrate only "some" harm (as opposed to egregious harm that must be shown in the case now before this Court). The *Ross* court—in a capital case in which the death penalty had been assessed—found "no harm" resulted from the erroneous jury instruction and affirmed Ross' conviction and sentence.

With *Ross* in mind, we do not believe the erroneous parole instruction affected the very basis of Billy's sentence, deprived him of an essential right, vitally affected a defensive theory, or made the case for punishment "clearly and significantly more persuasive"—as is required to establish egregious harm. *See Blumenstetter*, 135 S.W.3d at 240. In reaching this conclusion, we have reviewed the entire charge, the state of the evidence, counsels' arguments, and all other relevant information in the record; we cannot say Billy has satisfied his burden of demonstrating he suffered "egregious harm." While the trial court's instruction is clearly erroneous, there is nothing in the record that suggests the jury did not follow the trial court's instruction to not consider how good conduct time might apply to Billy. *Accord Ross*, 133 S.W.3d at 624. The jury sent no notes that might otherwise reveal either improper conduct or confusion among the jurors regarding the erroneous instruction. *Cf. Shavers*, 985 S.W.2d at 292. Additionally, the State did not reference the issue of parole in its punishment arguments, and the parole charge did not otherwise suggest Billy necessarily would be released from prison after he became eligible for parole. *Cf. Ross*, 133 S.W.3d at 624.

Accordingly, we affirm the trial court's judgment.