In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-08-00009-CR


______________________________




WILLIAM JAMES STEWART, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 294th Judicial District Court


 Van Zandt County, Texas


Trial Court No. CR05-00101




 




Before Morriss, C.J., Carter and Moseley, JJ.


Opinion by Chief Justice Morriss


Concurring Opinion by Justice Carter


O P I N I O N



 In a Van Zandt County (1) jury trial, William James Stewart was convicted of sexual assault
of a child under seventeen years of age. See Tex. Penal Code Ann. § 22.011(a)(2) (Vernon Supp.
2008). During the punishment phase of trial, without objection, the jury was erroneously charged
with  an  incorrect  statutory  alternative  regarding  parole  law.  See  Tex.  Code  Crim.  Proc.
Ann. art. 37.07, § 4 (Vernon Supp. 2008). The jury assessed punishment at twelve years'
imprisonment and a $5,000.00 fine, and Stewart was sentenced accordingly.

 On appeal, Stewart does not contest his conviction. Instead, he attacks the charge error
occurring at the punishment stage and also alleges ineffective assistance of counsel and a conflict
of interest by his counsel. We affirm the judgment of the trial court because (1) the punishment-phase charge error was not egregiously harmful to Stewart, (2) Stewart was not harmed by his
attorney's failures regarding the erroneous punishment charge, and (3) Stewart's attorney's prior
relationships did not color Stewart's defense.

 Stewart lived with A.N., A.N.'s mother, and Stewart's son in Van Zandt County in 2004 and
2005. A.N., Stewart's then-fifteen-year-old stepdaughter, described him as a good friend and
listener, one who encouraged her to stop her drug usage and to stop hurting herself--she had been
using drugs and having sex with boys since she was twelve years old and described herself as a
"cutter," one who physically injured herself. She testified that she began writing poems and letters
to him and that she was in love with him. She testified that she resented her mother for her
relationship with Stewart and eventually considered him her boyfriend. She testified that she had
sex with Stewart multiple times in 2004, that the sex was consensual, and that she stopped the sexual
relationship after she had an argument with her mother. 

 A.N. testified that her mother took her to a detention center in January 2005, where A.N.'s
statement was taken. In an interesting description of what followed, she testified the State's
representatives 

 tried to talk to me about some of the letters and poems that I had written Bill - or
about Bill, and I tried to deny everything that was going on. Then the blonde took
out some handcuffs and put them on my arms and then took me to the back where,
I guess - I want to say it was a holding cell, I guess you could say, and then they took
my jewelry off and my shoes off. And they put me in the holding cell and they had
me do exercises like jumping jacks and different exercises. 

She went on to testify that she finally told them something was going on because she wanted to go
home and was afraid that she would be stuck at the detention center if she did not tell them
something. A.N. added that she had severe asthma. She reiterated that even so, she was telling the
truth about their relationship.

 On cross-examination, she explained that her relationship with her mother was bad, that they
had fights, and that her mother had hit her in the face and "busted" her lip. A.N. went to police and
attempted to file charges against her mother. The month after A.N.'s attempt to file charges against
her mother, her mother took her to the detention center. A.N. testified that, after being questioned
at the detention center for about eight hours, she finally told them that she and Stewart had engaged
in sex. A.N. also testified that, looking back on the sexual relationship Stewart had enjoyed with her
during the three or four years before she testified at trial, she believes Stewart took advantage of her. 

 Two of Stewart's daughters from a previous relationship testified about their good
relationship with their father and their disbelief of any sexual impropriety. They also testified about
the conversations they had with A.N. in which she had stated repeatedly that nothing had happened
and that she had only said so in order to get out of the detention center.

(1) The Punishment-Phase Charge Error Was Not Egregiously Harmful to Stewart

 Stewart first complains because the wrong parole-law charge was given to the jury at
punishment. We agree. One paragraph dealing with parole contained erroneous language, and that
paragraph was included in the jury charge on punishment along with four others dealing with parole.

 The statute specifically sets out three lengthy, alternative jury charges concerning the parole
law; and those are to be chosen based on a very exacting and at least potentially confusing set of
conditions. See Tex. Code Crim. Proc. Ann. art. 37.07, § 4(a)-(c). Depending on the offense of
which a defendant has been convicted, whether his or her sentence is to be enhanced, and whether
a deadly-weapon finding has been made in connection with the conviction, the trial court is to select
which one of the three alternatives will be given to the jury. In Stewart's punishment trial, the wrong
one was chosen.

 The jury was charged that Stewart would not become eligible for parole "until the actual time
served plus any good conduct time earned equals one-fourth of the sentence imposed . . . ." See Tex.
Code Crim. Proc. Ann. art. 37.07, § 4(c) (emphasis added). (2) The charge should have indicated that
Stewart would "not become eligible for parole until the actual time served equals one-half of the
sentence imposed . . . without consideration of any good conduct time he may earn." See Tex. Code
Crim. Proc. Ann. art. 37.07, § 4(a) (emphasis added). (3) It should have also added that, if he were
sentenced to less than four years, he would be required to serve at least two years before being
eligible for parole. See id.

 Neither the trial court, nor the attorneys, caught the problem. Thus, since no objection was
made to the punishment charge, we look to see if egregious harm was caused by the error. Igo v.
State, 210 S.W.3d 645 (Tex. Crim. App. 2006); Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim.
App. 1984) (op. on reh'g). Jury-charge error is egregiously harmful if it affects the very basis of the
case, deprives the defendant of a valuable right, or vitally affects a defensive theory. Allen v. State,
253 S.W.3d 260, 264 (Tex. Crim. App. 2008).

 The standard of harm is that for unobjected-to error in the charge: whether "the error
is so egregious and created such harm that he has not had a fair and impartial trial --
in short[,] egregious harm. . . . [T]he actual degree of harm must be assayed in light
of the entire jury charge, the state of the evidence, including the contested issues and
weight of probative evidence, the argument of counsel and any other relevant
information revealed by the record of the trial as a whole." Almanza, 686 S.W.2d,
at 171.

Trejo v. State, 280 S.W.3d 258, 261 (Tex. Crim. App. 2009).

 Courts generally agree that the statutory parole instructions were designed to favor the State
and to increase sentences. See Arnold v. State, 786 S.W.2d 295, 300 (Tex. Crim. App. 1990). But,
the instructions can also help the defendant, because the jury could learn that the defendant would
serve longer than it expected and could be influenced to assess less time. Hooper v. State, 255
S.W.3d 262, 272 (Tex. App.--Waco 2008, pet. ref'd); Williams v. State, 975 S.W.2d 375, 378 (Tex.
App.--Waco 1998, pet. ref'd).

 First, we are to assess harm based, in part, on the entirety of the jury charge. The punishment
charge consisted of sixteen paragraphs. Five of those dealt with parole. The paragraph containing
the erroneous language is squarely in the middle of those five paragraphs. The two parole-related
paragraphs following the erroneous paragraph are correct, are statutorily required, and essentially
give the jury three main instructions: (1) one cannot predict how parole law and good conduct time
might be applied to this defendant; (2) the jury may consider the existence of parole law and good
conduct time, in general; but (3) the jury is not allowed to consider how good conduct time or the
parole law might affect or be applied to this defendant, in particular. In other words, the jury was
first erroneously instructed concerning when Stewart might become eligible to be considered for
parole, but then it was told that, although it could consider, in general, the existence of parole and
good conduct time, it could not apply that to Stewart, specifically.

 The charge error was, in the context of much additional correct language, effaced by specific
instructions not to apply the erroneous language to Stewart. This factor, alone, does not dictate a
finding of egregious harm.

 Second, we are also to assess harm based, in part, on the state of evidence, the contested
issues, and the weight of probative evidence.

 The court noted in Igo that the evidence relating to punishment was "exceptionally strong." 
In this case, several additional witnesses were called during the punishment phase. Jan Brooks, a
deputy director of the community supervision department for Van Zandt County, testified about her
experience with Stewart's pretrial supervision. She testified that he had always appeared for his
weekly visits, but had gotten behind on payments to the community supervision department ($300.00
per month for a GPS anklet, plus a $40.00 per month "supervision" fee, and an additional monthly
fee of $5.00 for urinalysis). She admitted that Stewart had caught up the shortfall and that he had
appeared each week after driving from south of Houston to Van Zandt County, for two years. She
complained, however, that his attitude was not the best. 

 During guilt/innocence, A.N. testified that she had vaginal sex with Stewart many times in
Van Zandt County. The State called A.N. to the stand again during the punishment phase of trial. 
She then supplemented her prior testimony by recounting multiple instances of oral sex each
performed on the other. She testified to one instance of anal penetration by Stewart, which hurt. She
testified again that none of her actions were forced or coerced and that she engaged in the activity
solely because she wanted to. She also indicated she had been in counseling as a result of the
relationship with Stewart. She acknowledged, testifying with the perspective gained by having
attained the age of eighteen years, that the relationship with Stewart when she was between the ages
of thirteen and fifteen was wrong, that Stewart had taken advantage of her, and that, if she had it to
do over again, she would stop him from the sexual relationship. She thinks it possible that Stewart
might "do this" to someone else. 

 The defense also called several witnesses. Stewart's employer, Nancy Luke, testified about
his superior and reliable work. Stewart's roommate found him entirely trustworthy and a good
person. Stewart's current girlfriend, Janice Boyd, who had lived with him for about fifteen months,
explained that he had lost work for about a month after being bitten by thirteen spiders while
mowing the yard and being placed on heavy antibiotics. She testified that, at this point, he could not
walk or care for himself and that she had also provided some of the money to catch him up for the
two months that he was behind on his payments. 

 Boyd testified at some length that she had come to trust Stewart, that his character was
exceptional, and that his interactions with his own daughters was loving and careful. One of those
daughters, with a special-needs daughter of her own, had moved in with Stewart and Boyd for a time. 
Boyd also explained that they had provided financial assistance for the daughter and granddaughter
while they were living there.

 Charlene O'Brien, one of Stewart's three adult daughters, testified at punishment that Stewart
was a very strict parent and that, when Stewart and her mother had divorced, Stewart was given
custody of all three daughters. She stated that the relationships were strong and good and that there
was no sexual impropriety with her. The State chose not to cross-examine O'Brien.

 While the punishment evidence beyond the sexual relationship itself is not "exceptionally
strong," the extended and varied sexual relationship, the vulnerable position of A.N. essentially as
Stewart's stepdaughter, and the visceral nature of the offense itself offer sufficient support to explain
the jury's assessment of punishment without suggesting harm from the charge. Thus, nothing in the
evidence suggests that the jury acted on the erroneous language.

 Third, we are to assess harm based, in part, on the arguments made by counsel. The parole
charge was the subject of argument by both the State and defense counsel, and both of them argued
using the incorrect charge language.

 The initial part of the State's closing argument at punishment was a relatively brief ninety-nine lines of transcribed text in the reporter's record. During this argument, the State sought to
defuse the effect of Stewart's character witnesses or his positive family or behavioral evidence,
instead seeking to refocus the jury on the seriousness of the offense, in which a forty-five-year-old
man had vaginal, oral, and anal sex with a fifteen-year-old girl. It also sought to deal with the
evidence that the relationship between Stewart and A.N. was described as loving, gentle, and
noncoercive, and to remind the jury of the relative ages of the "couple" and the responsibility under
the law for the adult to refrain from such behavior with a child.

 Near the beginning of this portion of the argument, the State mentioned that parole law and
good conduct time exist, but added this discussion:

 The judge has, in the charge, shown to you in paragraph 8, you are not to consider the
manner which the parole law may be applied to this particular defendant, but you are
allowed to consider that that parole law exists, that good conduct time exists, so I
think that's important when you're back there trying to determine amongst yourselves
what's -- what's appropriate for this defendant.

At that point, in eleven lines of transcribed text, Stewart objected, making the point that the effect
of the parole law is not to be considered by the jury in determining Stewart's sentence. The State
responded, in ten lines of transcribed text, by apologizing to the trial court "if that was confusing to
the jury" and emphasized the instruction in paragraph 8 that the jury is not to consider how parole
law might be applied to Stewart. None of these comments used or referred to the erroneous language
in the punishment charge.

 Stewart's closing argument at punishment covered a hefty 338 lines of transcribed text. 
During this argument, counsel addressed the range of punishment and the jurors' need to consider,
not only the maximum, but also the minimum end of the range. Counsel also attempted to defuse
the fact that the offense was sexual assault of a child, noted how the grade of offense changes with
various circumstances, and made a serious effort at giving the jury a rationale for satisfactorily
assessing punishment in the lower end of the range. He made a foray into Biblical concepts about
human weaknesses toward fleshly sin. He talked about the love between the parties. He painted the
picture of Stewart as a valiant and loving family man. He touched on the lifetime obligation Stewart
will have to register as a sex offender. He urged a lower punishment.

 During that closing argument, Stewart's counsel touched on parole law twice. Two or three
pages into his argument, counsel discussed the parole law in twenty-seven lines of argument. At this
time, counsel made no reference to the erroneous charge language and emphasized his main point
that the jury was not to consider the effect of the parole law on Stewart. 

 Near the end of his argument, Stewart's counsel again referenced parole law, this time in
fourteen lines of argument. During that segment of his argument, counsel reiterated to the jury that
it was not allowed to use the effect of parole law on Stewart to calculate his sentence. In the process,
he made this argument:

 [Parole law] is out there, but you cannot go back there and say, ["]Well, okay, if he's
really good and he paroles out after a quarter of his time, I want to make sure he does
X number of years, so let's give him the X to make sure he does that.["] You cannot
do that. That's not your consideration. You say, ["]You did this, these are the
number of years that you deserve, and it's up to the TDC to decide if and when you
get out and under what restrictions.["]

It must be noted that counsel, here, did make a passing reference to the erroneous one-quarter
measure as used in the charge to the jury, but it was all couched in terms urging the jury not to use
any of that to calculate Stewart's sentence.

 The rebuttal portion of the State's closing argument at punishment consumed ninety-nine
lines of transcribed text. At no point during that argument did the State's attorney return to the
subject of the parole law.

 While both sides made reference to the parole law in closing arguments, both emphasized
that how it applied to Stewart was not to be considered in assessing punishment. There was only one
small, transitory reference to the erroneous charge language, and that was in the context of
emphasizing that the jury was not to use the parole law to calculate Stewart's sentence. The issue
of the parole law was not central to the case regarding punishment.

 We conclude that the jury arguments do not establish egregious harm.

 Finally, we are to assess harm based, in part, on any other relevant information revealed by
the record.

 Nothing in the record suggests that the jury had any question concerning either the
application or meaning of the parole law or that the parole law affected its assessment of punishment. 
There is no indication of how the jury read or applied the parole law given, or of any untoward
attention the jury might have given to the parole law. Thus, there is no active showing of any effect
on the jury's deliberation or its assessment of punishment.

 At twelve years' imprisonment, the prison term is not the maximum possible; in fact, it is
close to the middle of the permissible range of two years to twenty years. In the same way, the fine
of $5,000.00 is precisely half of the maximum the jury could have assessed, that is, $10,000.00. 
Thus, one matter often used to show harm will not apply, as the sentence was not particularly harsh.

 The middle-of-the-range punishment does not support a conclusion that the jury attempted
to apply the parole law to Stewart, or to predict how it might be applied to him. Because the jury
was instructed not to consider how the parole law might apply to Stewart, any harm to him here
would be the result of a violation of the statute by the jury. We are to presume that the jury follows
the instructions given to it by the trial court, unless there is indication to the contrary. Gamboa v.
State, No. AP-75,635, 2009 WL 928552, at *4 (Tex. Crim. App. Apr. 8, 2009); Luquis v. State, 72
S.W.3d 355, 366-67 (Tex. Crim. App. 2002).

 The State argues that we should be guided by Igo. (4) In Igo, the Texas Court of Criminal
Appeals held that--in spite of an incorrect conversion of one-quarter to one-half like the one in this
case--the error did not cause egregious harm because, (1) even though the maximum punishment
was given, (2) the parole instruction contained the standard curative language admonishing the jury
not to consider the extent to which the parole law might be applied to the defendant, (3) parole was
mentioned by neither counsel during argument, and (4) the evidence relating to punishment was
exceptionally strong. Igo, a teacher, had taken a fifteen-year-old student on a trip, had engaged in
sex with her, had continued the relationship even after indicted, and had tried to bribe her to drop
the charges. Igo, 210 S.W.3d at 647.

 The State uses Igo as the basis for its argument that we should distinguish the present case
from our decision in Hill v. State, 30 S.W.3d 505 (Tex. App.--Texarkana 2000, no pet.). In Hill,
we applied the Almanza egregious-harm standard to a similar, but arguably weaker, parole-charge
error. We noted the importance of the fact that the charge erroneously indicated Hill was entitled
to good conduct time. We found that fact to be important because the statutory charge states that the
jury may consider the existence of the parole law and good conduct time in making its decision. We
discounted the language that the jury was not to attempt to apply the parole law to Hill. We then
concluded that the court's "misstatement of the law in [that] case misled the jury and seriously
affected how it viewed the existence of parole and good conduct time, which the instructions plainly
told the jury it could consider." Id. at 508. (5)

 As is explicitly stated by the dissent in Hill, the charge also directed the jury not to consider
how parole might apply to the defendant. The majority, however, pointed out that the error
concerned whether or how parole might apply to this particular defendant and misled the jury about
the general existence of the parole law and good conduct time and that the misstatement about the
parole system itself was not cured by that instruction. Id. at 509. Thus, we found egregious harm.

 We revisited the same scenario four years later in Taylor v. State, 146 S.W.3d 801 (Tex.
App.--Texarkana 2004, pet. ref'd). In Hill, the jury had been improperly instructed that the
defendant would be eligible for parole when actual time served plus good conduct time equaled one
half the sentence or thirty years, whichever was less. In Taylor, we placed considerable importance
on the fact that the instruction, although similar to that in Hill, also contained a statement that parole
would be calculated "without consideration of any good conduct time." See also Villarreal v. State,
205 S.W.3d 103, 110 (Tex. App.--Texarkana 2006, pet. dism'd) (focusing to some extent on jury
notes concerning parole law); Loun v. State, 273 S.W.3d 406, 417-19 (Tex. App.--Texarkana 2008,
no pet.) (error preserved, some harm found).

 In Taylor, we also acknowledged that, in Ross v. State, (6) the Texas Court of Criminal Appeals
had found no harm, even though Ross had objected to an erroneous parole charge--thus requiring
reversal if there was some harm. In Ross, a capital case in which the death penalty had been
assessed, the erroneous jury instruction contained two paragraphs of improper instructions regarding
"good conduct time." Yet the high court found "no harm."

 With Ross in mind, we concluded in Taylor that the erroneous parole instruction did not
affect the very basis of Billy's sentence, deprive him of an essential right, vitally affect a defensive
theory, or make the case for punishment "clearly and significantly more persuasive"--as is required
to establish egregious harm. See Taylor, 146 S.W.3d at 810-13; see also Blumenstetter v. State, 135
S.W.3d 234, 240 (Tex. App.--Texarkana 2004, no pet.). 

 In Igo, like this case, the jury was erroneously instructed that the defendant would not
become eligible for parole until the actual time served, plus good conduct time, equaled one-fourth
of the sentence imposed, but the jury should have been instructed that he would not become eligible
for parole until the actual time served, without considering good conduct time, equaled one-half of
the sentence imposed. Igo, 210 S.W.3d at 646. The Texas Court of Criminal Appeals concluded
that egregious harm was not shown, noting that the parole instruction contained the standard curative
language admonishing the jury not to consider the extent to which the parole law might be applied
to the defendant. (That matches the facts in this case.) The court also noted that parole was not
mentioned by either counsel during argument on punishment. (That is not like this case: the parole
law was discussed to some degree here by both counsel during final arguments.) In Igo, which is
also a sexual assault case, the defendant continued his relationship with the underage girl after being
indicted, and had attempted to use the same tactics with another girl, and the teacher/student
relationship involved was pointed out as being especially heinous.

 In Hooper, involving a charge of assault on a public servant, the punishment charge
contained erroneous language, the parole instructions were not mentioned during argument, the
punishment evidence was considered strong (two prior felony convictions for possession of cocaine
and possession of cocaine with intent to deliver), there were no jury notes sent out, and the
punishment was not extreme. Despite the trial court's two failed attempts to correct the charge error,
thus bringing some attention to the erroneous language, the appellate court found no indication that
the jury improperly considered the effect of the parole law on Hooper, thus concluding that harm
would be only speculative or theoretical. See Hooper v. State, 255 S.W.3d 262, 272-73 (Tex.
App--Waco 2008, pet. ref'd).

 Here, evidence suggests that the sexual relationship between Stewart and A.N. had ended by
the time A.N. was taken to the detention center by her mother. There is no evidence that Stewart
either had or attempted to begin a similar relationship with any other underage person while he was
awaiting trial. The evidence shows no violence, no threat (explicit or implicit), and no history of any
prior sexual misbehavior by Stewart. It suggests, instead, that Stewart had been the custodial parent
for three young daughters of a prior marriage. Stewart's oldest daughter, a nurse, testified at
punishment that Stewart had been a good, although very strict, parent. His second daughter, April,
testified similarly at guilt/innocence, but not at punishment. There was no indication of any sexual
relationship with any of his natural daughters.

 In Igo, the high court noted in its analysis that Igo's sexual assault was by a teacher against
his fifteen-year-old student and that such "conduct was abuse of [Igo's] position as a teacher." Igo,
210 S.W.3d at 647. Here, the field of potentially endangered children is much smaller, but the abuse
of position is no less a factor. Igo tried to bribe his victim after the fact, while Stewart merely
ingratiated himself to his victim. Igo's sexual contact with his victim was isolated; Stewart's was
extensive, varied, and ongoing for some time. Igo received the maximum sentence of twenty years'
imprisonment; Stewart received a mid-range twelve years. In Igo's trial, parole law was not
mentioned in argument; in Stewart's, it was mentioned, but in the context of the instruction, not to
consider how it might apply to Stewart.

 The question before this Court is whether, on these facts, Stewart suffered egregious harm
from the erroneous charge language.

 The charge error here is troubling, as is mention of parole during argument. On the other
hand, appellate courts have been directed by the Texas Court of Criminal Appeals effectively to
disregard such errors, under the presumption that the jury will follow the curative language directing
the jury not to apply the information to the particular defendant.

 Under the stringent standards necessary to show "egregious harm," we conclude that this
error did not deprive Stewart of a fair and impartial trial or affect the very basis of the case, deprive
Stewart of a valuable right, or vitally affect a defensive theory. Thus, on review of the entirety of
the record, we conclude that egregious harm has not been shown.

(2) Stewart Was Not Harmed by His Attorney's Failures Regarding the Erroneous Punishment
Charge

 Stewart next contends that he did not receive constitutionally effective assistance of counsel
at trial. That argument is based exclusively on the matters discussed above: counsel's failure to
object to the incorrect charge, and then compounding his error by arguing the incorrect law to the
jury at punishment.

 This matter was discussed at a hearing on Stewart's motion for new trial. In relation to this
matter, trial counsel focused his attention on a letter in his file in which he warned Stewart about the
correct percentage of time that would have to be served before he would become eligible for parole. 

 The motion itself was not directed at a claim of ineffective assistance of counsel, and the
hearing was not held for that purpose. 

 The standard of testing claims of ineffective assistance of counsel is set out in Strickland v.
Washington, 466 U.S. 668 (1984). To prevail on this claim, an appellant must prove by a
preponderance of the evidence (1) that his or her counsel's representation fell below an objective
standard of reasonableness and (2) that the deficient performance prejudiced the defense. Id. at 689;
Rosales v. State, 4 S.W.3d 228, 231 (Tex. Crim. App. 1999). To meet this burden, the appellant
must prove that the attorney's representation fell below the standard of prevailing professional norms
and that there is a reasonable probability that, but for the attorney's deficiency, the result of the trial
would have been different. Tong v. State, 25 S.W.3d 707, 712 (Tex. Crim. App. 2000). Under this
standard, a claimant must prove that counsel's representation so undermined the proper functioning
of the adversarial process that the trial cannot be relied on as having produced a just result. 
Strickland, 466 U.S. at 686. 

 Stewart complains that counsel was ineffective because he failed to object to an incorrect
parole charge, and then compounded his failure by discussing the incorrect sections before the jury.

 The ineffectiveness of counsel is a matter that must be firmly founded in the record, and the
record must affirmatively demonstrate the alleged ineffectiveness. Smith v. State, 51 S.W.3d 806,
813 (Tex. App.--Texarkana 2001, no pet.). Normally, where an appellate record is silent as to why
trial counsel failed to take certain actions, the appellant has failed to rebut the presumption that trial
counsel's decision was in some way (conceivable or not) reasonable. See Mata v. State, 226 S.W.3d
425, 431 (Tex. Crim. App. 2007). That concept does not apply here, as counsel clearly was unaware
that the charge was erroneous.

 In the absence of direct evidence of counsel's reasons for the challenged conduct, an appellate
court will assume a strategic motivation if any can be imagined. Garcia v. State, 57 S.W.3d 436,
441 (Tex. Crim. App. 2001). We will not conclude the challenged conduct constitutes deficient
performance unless the conduct was so outrageous that no competent attorney would have engaged
in it. Id.; see Thompson v. State, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999). We can imagine no
way in which Stewart would benefit by allowing the jury to believe that he might be able to get out
of jail much earlier than he actually could. In this case, we know both what counsel's inaction was
(failure to object) and what his action was (arguing the incorrect law). There is no strategic or
tactical motivation that would justify this action or this inaction. It was, simply, a mistake in
understanding the application of an overly complicated statute.

 While the trial court's instruction is clearly erroneous, there is nothing in the record that
suggests the jury did not follow the trial court's instruction to not consider how good conduct time
might apply to Stewart. Accord Ross, 133 S.W.3d at 624. The jury sent no notes that might
otherwise reveal either improper conduct or confusion among the jurors regarding the erroneous
instruction. Cf. Shavers, 985 S.W.2d at 292. Under these facts, we do not believe that the record
shows there is a reasonable probability that, but for the attorney's deficiency, the result of the
punishment proceeding would have been different, and we are not prepared to speculate to reach
such a result. We overrule this contention of error.

(3) Stewart's Attorney's Prior Relationships Did Not Color Stewart's Defense

 Stewart finally argues that his trial counsel was ineffective due to an impermissible conflict
of interest because counsel was also, at the same time, working as a special prosecutor in a mentor
capacity with the prosecutor who tried this case. 


 In order to prevail, Stewart must show an actual conflict of interest and that the conflict
"actually colored" counsel's actions. Acosta v. State, 233 S.W.3d 349, 356 (Tex. Crim. App. 2007).

 The evidence at the hearing on motion for new trial was that counsel had acted as a special
prosecutor for two cases and that the trials on those cases ended before this trial began. (7) 

 Neither of these cases had any apparent connection with this prosecution. Stewart's argument
is that his retained trial counsel had failed to pursue a plea agreement up to the time of trial because
he did not want to negatively interact with his former, and possibly his future employer, the district
attorney.

 The record does not support this argument. Counsel was working on both sides of the
docket, but not concerning this case. Even though he had been acting as a mentor for the assistant
district attorney who tried this case, (8) there is nothing to suggest that defense counsel's actions were
improperly colored by the relationship.

 Further, although counsel did state that, in hindsight, he probably should have continued right
up to the day of trial to obtain a satisfactory plea bargain, that alone does not suggest that his actions
were colored by the relationship. 

 We affirm the judgment.



 Josh R. Morriss, III

 Chief Justice






CONCURRING OPINION



 This case is different from Hill (9) and Taylor (10) in a very significant respect. Both Hill and
Taylor involved a faulty instruction regarding the effect of "good conduct time." In both cases, the
jury was instructed that good conduct time would be considered in determining eligibility for parole
in situations where good conduct time was not authorized. "Good conduct time" is a phrase that
would be difficult to directly apply to a punishment assessment. 

 In this case, a more important mistake was made. The jury was also told that Stewart would
be eligible for consideration of parole when he served one-fourth of his sentence or thirty years,
when he actually must serve one-half of his sentence or thirty years. While the nebulous concept of
good conduct time and its applicability may be unfamiliar to a jury, whether one must serve only
one-fourth rather than one-half of the sentence is not ambiguous. The Legislature has mandated that
such an instruction be given together with an instruction that the jury should not attempt to apply
parole eligibility to the defendant. But what is the effect of such an instruction? This is not a general
instruction that a parole law exists, but gives actual numbers that are easily converted into a term of
years. 

 The jury was instructed that Stewart would be eligible for parole when he served twenty-five
percent of his sentence when he actually must serve at least fifty percent. It is one thing to generally
instruct a jury about parole; instructions about good conduct time may not cause egregious error, but
it is much more important that the numbers given in the instruction be correct. I would find that the
error deprived Stewart of the valuable right to have the jury properly instructed as to the percentage
of the sentence legally required to be served before parole eligibility. In my opinion, egregious harm
has been established. But we have the precedent of the Texas Court of Criminal Appeals opinion
in Igo. (11)

 In Igo, the Texas Court of Criminal Appeals upheld the court of appeals' finding that no
egregious harm was shown when a jury was similarly misinformed. (one-fourth instead of one-half). 
The court specifically emphasized that the subject of parole law was not mentioned in closing
argument and the punishment evidence was extremely strong. Here, a jury found that Stewart was
guilty of sexually assaulting a minor numerous times; that evidence alone is powerful in assessing
punishment. In Igo the defendant was assessed the maximum punishment, which did not occur here. 
That only leaves the fact that the attorneys referred to the instruction in this case, whereas they did
comment on it in Igo. I do not believe the comments by counsel in this case are significant enough
to distinguish Igo on that basis. 






 Without the binding precedent of Igo, I would hold that such a flagrantly incorrect statement
of the law given to the jury produced egregious harm. Since we are bound by the Igo precedent, I
concur in this result. 


 Jack Carter

 Justice


Date Submitted: April 30, 2009

Date Decided: July 31, 2009


Publish
1. This case was transferred to this Court from the Twelfth District Court of Appeals in Tyler
as  part  of  the  Texas  Supreme  Court's  docket  equalization  program.  See  Tex.  Gov't  Code
Ann. § 73.001 (Vernon 2005). We are not aware of any conflict between the precedent of the Tyler
Court and the precedent of this Court on any issue relevant in this appeal. See Tex. R. App. P. 41.3.
2. The charge under subsection (c) is to be used


 if the offense is punishable as a felony of the second or third degree, if a prior
conviction has been alleged for enhancement as provided by Section 12.42(a), Penal
Code, or if the offense is a felony not designated as a capital felony or a felony of the
first, second, or third degree and the maximum term of imprisonment that may be
imposed for the offense is 60 years or less, unless the offense of which the jury has
found the defendant guilty is listed in Section 3g(a)(1), Article 42.12, of this code or
the judgment contains an affirmative finding under Section 3g(a)(2), Article 42.12,
of this code . . . .


Tex. Code Crim. Proc. Ann. art. 37.07, § 4(c) (emphasis added). The key phrase which excludes
subsection (c) as the applicable subsection is the one italicized above, referring to Section 3g(a)(1)
of Article 42.12 of the Texas Code of Criminal Procedure, which lists Stewart's offense, sexual
assault of a child under seventeen years of age.
3. The charge under subsection (a) is to be used


 if the offense of which the jury has found the defendant guilty is listed in Section
3g(a)(1), Article 42.12, of this code or if the judgment contains an affirmative finding
under Section 3g(a)(2), Article 42.12, of this code, unless the defendant has been
convicted of an offense under Section 21.02, Penal Code, an offense under Section
22.021, Penal Code, that is punishable under Subsection (f) of that section, or a
capital felony . . . .


Tex. Code Crim. Proc. Ann. art. 37.07, § 4(a) (emphasis added). The phrase italicized above
makes subsection (a) applicable to Stewart's offense.
4. The State also suggests that Luquis is relevant for the proposition that any error in the
statement of the general parole law cannot be considered harmful. 72 S.W.3d at 360. Luquis is not
on point. The issue in that case was whether the mention of the existence of good conduct time in
the statutory charge violated due process, because that defendant would not qualify for the
application of the time. The court found that it was not unconstitutional and that, even though the
instruction was misleading, the legislative requirement that it be given meant that a court could not
err by giving the instruction as written. Although that argument may be correct, that is not applicable
to this case.
5. The State also relies on Shavers v. State, 985 S.W.2d 284 (Tex. App.--Beaumont 1999, pet.
ref'd), for the proposition that, because the maximum sentence was not assessed, egregious harm
could not be shown. We addressed and distinguished that concept (and the Beaumont court's
reasoning) in our opinion in Hill. 30 S.W.3d at 508. The State's argument is taken in part from
Chief Justice Cornelius' dissent in the Hill case.
6. 133 S.W.3d 618 (Tex. Crim. App. 2004).
7. Counsel was sworn in as special prosecutor May 1, 2007. The trial for which he was
prosecutor (sitting as second chair for the assistant district attorney who tried this case) ended 
October 30, and this trial occurred November 13-14.
8. They had tried the previous one together, with counsel sitting second chair as support for
the new assistant.
9. Hill v. State, 30 S.W.3d 505 (Tex. App.--Texarkana 2000, no pet.).
10. Taylor v. State, 146 S.W.3d 801 (Tex. App.--Texarkana 2004, pet. ref'd).
11. Igo v. State, 210 S.W.3d 645 (Tex. Crim. App. 2006).



ily:
Calibri;mso-fareast-theme-font:minor-latin;mso-ansi-language:EN-US;mso-fareast-language:
EN-US;mso-bidi-language:AR-SA'>[2]Lawson
suggests that this Court rule on the merits of the forfeiture action.  This Court does not have jurisdiction to
determine the merits of the forfeiture action currently pending in the trial
court. 





[3]Exhibit
B to Lawsons petition is a copy of a notice of intent which advises the trial
court of the pending motion to dismiss for want of prosecution and intent to
file a petition for writ of mandamus to compel the trial court to act on said
motion.  Notwithstanding the incorrect
salutation, the office of the Cass County District Clerk has confirmed said
notice of intent was filed on November 12, 2010.  Exhibit C to Lawsons petition is a copy of a
letter to the Cass County District Clerk dated November 14, 2010, asking the
clerk to present Lawsons motion to dismiss to the trial court for
consideration.  While the attached letter
is not file-marked, the office of the Cass County District Clerk has confirmed
said letter was filed on November 17, 2010.