COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| CARLOS ARTURO NUÑEZ ZUNIGA, | § | No. 08-23-00339-CR |
| Appellant, | § | Appeal from the |
| v. | § | 409th Judicial District Court |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 20200D06161) |

## MEMORANDUM OPINION

A jury found Appellant Carlos Arturo Nuñez Zuniga guilty of continuous sexual abuse of a child under 14 years of age and sentenced him to 35 years in prison.[1]  Appellant brings two issues on appeal, one for each phase of trial. First, he contends the trial court erred during the guilt-innocence phase by permitting a witness to testify generally on delayed outcries of child victims without sufficient qualification as an expert witness. Second, he argues the trial court committed charge error during the sentencing phase by including an instruction on good conduct credit, though Appellant did not qualify, thereby resulting in prejudicial harm. Finding no error, we affirm.

---

[1] *See* Tex. Penal Code Ann. § 21.02.

# I. FACTUAL BACKGROUND[2]

A grand jury issued a two count indictment against Appellant. Count one alleged he had committed sexual abuse of a child victim who was under the age of 14, continuous during a period of more than 30 days duration, from April 2009 through April 2016, when Appellant was 17 years of age or older, by committing two or more acts of sexual abuse against the complaining witness, M.M. [3] (Count I). Count two alleged Appellant intentionally or knowingly engaged in sexual contact with M.M. by touching her body or sexual organ with his sexual organ, with the intent to arouse or gratify his sexual desire, when she was younger than 17 years of age (Count II). Before trial, the State filed a motion to dismiss Count II, which the trial court granted. After Appellant pleaded not guilty to Count I, the following evidence was presented to a jury.

M.M. was 20 years old at the time of trial. In 2009, when she was approximately 5 or 6 years old, she lived with her mother, Appellant, and her half-brother (C.N.), in Appellant's mother's house in El Paso. C.N., who was Appellant's son, was 3 to 4 years older than M.M. M.M. recalled that, one day, her mother left for Juarez, Mexico, and never came back. Thereafter, M.M. and C.N. continued to live with Appellant, though they moved several times to various places in the city. Although Appellant was not her biological father, M.M. thought of him as a "father figure," and she called him "dad."

M.M. testified to several acts of sexual abuse beginning when she was in the first or second grade, when she was about 6 years old, and continuing until she was 14 years of age. She described the first time she felt uncomfortable with Appellant. M.M., C.N. and Appellant were then living

---

[2] Our factual recitations are taken from the trial court record. Because Appellant does not challenge the sufficiency of the evidence to support his conviction, we set forth only an abbreviated factual background.

[3] To protect the identities of any person who was a minor at the time of the incident, the opinion will refer to them by their initials. *See* Tex. R. App. P. 9.10(a)(3).

at Appellant's mother's home with all three of them sharing a room together. During the night, it was thundering or raining. M.M. described that Appellant put her up on top of him, held her hips against him, and started "grinding." She described that he rubbed his penis against her vagina through their clothing. M.M. testified that Appellant looked like he enjoyed himself because his breathing changed. Incidents of this type occurred "a couple of times" while she was living with Appellant at his mother's home.

The next incident occurred when M.M. was in the third grade. M.M., C.N., and Appellant had all moved to a mobile home. Appellant was sitting on the couch while she sat on the floor. M.M. leaned on his leg. Appellant then grabbed her head and put it towards his penis. Suddenly, C.N. came into the room. Appellant played it off as if they were wrestling. M.M. testified she had felt scared when Appellant grabbed her head and pulled it towards his sexual organ. After they had moved to a westside apartment, Appellant again tried to grab her head and turn it forcefully towards his penis. By that time, M.M. had entered the eighth grade and she was about 13 or 14 years old.

M.M. also described another incident occurring when she was in the sixth grade. She was in the shower when Appellant came in the bathroom to use the toilet. At one point, Appellant reached into the shower. He grabbed her hand and put it on his penis. Appellant stopped what he was doing once C.N. knocked on the bathroom door. Along with these incidents, M.M. also testified that Appellant would frequently grab her vagina, her breast, or her buttocks and make an "enjoyable grunt" as she walked around the house. She also described that he would forcibly kiss her and put his tongue in her mouth.

In 2017, during her sophomore year of high school, M.M. went to live with her aunt, who had become her guardian. Her aunt noticed that M.M. was very quiet and would not speak at all;

3

she had nightmares and trouble sleeping. When her aunt asked her if she wanted to see a counselor, M.M. agreed. Recalling that time period, M.M. described that she felt anxious all the time; she had flashbacks; she did not like for anyone to touch her; and she had a hard time getting through her days. M.M. testified she was eventually prescribed medications.

M.M. eventually spoke up about the abuse she experienced. Her aunt suggested she report it to the police. When she felt she was ready, M.M. spoke to law enforcement and she was interviewed at her home and at the Center Against Sexual and Family Violence (CASFV). She said she did not report anything earlier because she lacked confidence. She also described that she had been afraid of losing her family, and of never again seeing her uncles, aunts, cousins, and brother. A detective who interviewed M.M., and a director of the CASFV, described to the jury that child outcries are sometimes delayed due to fear or other reasons such as difficulty processing and reporting details.

Maria Chairez also testified during the trial. From 2014 to 2019, she described that she had been in a relationship with Appellant, and they shared a daughter. Chairez testified she spent a lot of time with M.M. and C.N. She said she first met M.M. when M.M. was 13 years old. Chairez said that when M.M. was about 14 years old, she witnessed Appellant use both of his hands to grab M.M.'s breasts and "jiggle" them. She also witnessed him touch M.M.'s buttocks in "a spanking motion," which she described as "[having] this vulgar feeling to it." Providing further detail, she testified his touching of M.M.'s buttocks appeared out of nowhere and it did not appear to her to relate to his correcting of M.M.'s behavior.

In its case in chief, the defense called El Paso Police Officer Aaron Ulloa who testified he was the officer who took the initial report from M.M. He thought M.M. had said C.N. was present for only one of the incidents, but that he was asleep at the time. His report did not reflect M.M.

4

telling him that C.N. knocked on the bathroom door during the shower incident. M.M. also did not mention anything to him about wrestling.

Appellant also called C.N. to testify. He testified he was then 25 years old. He was confused and heartbroken when he heard about M.M.'s allegations and he believed them to be false. He said he could not recall his father ever wrestling with him and M.M., and he was not the type of father to engage in physical play. C.N. testified the incident of M.M., him, and Appellant all wrestling together "never happened." Regarding the shower incident, C.N. said there was no need for his father to use the bathroom while M.M. was showering because they had a second bathroom. C.N. described that during this period of their childhood their mother had threatened to take both he and M.M. to live with her in Mexico. He claimed that M.M. chose to stay and continue to live with Appellant. He also described, however, that M.M. became very rebellious around the time Ms. Chairez became pregnant, and she often would not come home.

Once the guilt-innocence phase of trial concluded, the case was submitted to the jury. The jury returned a verdict finding Appellant guilty of sex abuse of a child, continuous, with a victim under 14 years old. Following the punishment phase, the jury assessed punishment at 35 years' confinement and a $7,500 fine. The trial court entered judgment in accordance with the jury's verdict. Appellant filed a motion for new trial which was overruled by operation of law. This appeal followed.

## II. ADMISSION OF TESTIMONY

In his first issue, Appellant contends the trial court erred by permitting Angel Carroll, the associate director of the CASFV, to provide opinion testimony during the guilt innocence phase of trial without being qualified to do so. Specifically, he complains that Carroll provided testimony on delayed outcries by victims without sufficient qualification as an expert in this "specific area."

Citing to Rule 702 of the Texas Rules of Evidence, Appellant contends there was no indication at trial that Carroll possessed specialized training or education specifically related to the psychology of delayed outcries in child abuse cases. Appellant maintains he was harmed by the improper admission of Carroll's testimony because expert testimony on delayed outcries can substantially influence the jury's perception of the victim's credibility.

The State retorts on appeal that Carroll's education, training, and work experience established she had specialized knowledge and expertise in assisting adult and child victims of domestic violence and sexual abuse. To that extent, the State claims she was qualified to generally testify in the area of delayed outcries. Nevertheless, the State also points out that Carroll's testimony was not critically important to establishing the central issue in the case, i.e., whether M.M.'s sexual-abuse allegations were credible and accurate. As to that central issue, it argues that Carroll provided no conclusive opinion as she readily acknowledged during her testimony that she had not met either M.M. or Appellant, that she had no familiarity with the facts of the case, that she was rendering no opinion on why M.M. delayed her outcry, and that she neither opined on whether M.M. testified truthfully or had fabricated the abuse allegations against Appellant.

### A. Carroll's trial testimony

Carroll testified she held a bachelor's and master's degree in criminal justice. She testified she was an associate director of the CASFV and oversaw the center as a whole. In that capacity, she described that she worked with victims of all ages. Her work included direct interaction with child victims of sexual assault and their families. She received training with other persons involved with victim services including district attorney's offices, law enforcement officers, victim advocates, and sexual assault and forensic nurses. Part of her training included the identification of aggressors and abusive behaviors, and cries for help from survivors of crime. She had been

6

working in her current position for 10 or 11 months. Previously, she had worked for about 5 years leading the victim services department of a police department located in central Texas.

After a brief discussion of her background and training, the State asked Carroll whether, in the course of her career interacting with child victims of sexual abuse, she had witnessed grooming behavior. She responded: "Absolutely. That is something we see very often." The prosecutor next asked for Carroll to describe its meaning to the jury. Defense counsel objected, asserting the witness was not qualified to testify "within the scope that she is about to." From that point, the trial court excused the jury from the courtroom. The court next inquired into whether the State intended to qualify Carroll as an expert witness, and whether she had interviewed or met with M.M. or Appellant. The State answered negatively as to both inquiries. The State added that it merely intended for Carroll to testify generally about behaviors that are known to be present with child victims. The court next permitted defense counsel to question Carroll on voir dire. Carroll acknowledged during that testimony that her current position at the CASFV was the first job she held in which she oversaw services for sexual assault victims, both adults and children. She also disclosed that she held no degree in psychology or counseling. She further confirmed she had never published nor had a speaking engagement in which she spoke about child abuse per se.

The State then disclosed to the court that it planned to ask Carroll about the following when testimony resumed in front of the jury: (1) what grooming behavior is and how it makes children more vulnerable to abuse; (2) delayed outcries and why they occur; (3) statistics generally with regard to the underreporting of child sex abuse; and (4) the effect of a victim knowing his or her abuser and how the relationship can affect an outcry or delay an outcry, and whether victim behaviors could differ widely. The court followed by asking Carroll whether she had read published literature with regard to recognized signs of grooming. Carroll responded affirmatively,

explaining that grooming is typically referred to as a process that happens when an aggressor targets a child with conduct such as gift giving or asking a child to keep secrets. She added that asking a child to keep a secret isolates them from other trusted individuals. She also described that other grooming-type conduct included the "minimalizing or normalization of sharing pornography photos or inappropriately touching the child and then normalizing that type of behavior and then kind of desensitizing that type of behavior[.]" Carroll acknowledged that she did not know what, if any, grooming methods may or may not have been used in the instant case as she had not reviewed the police reports nor any witness statements. She also said she could not opine specifically on whether a delayed outcry occurred in this case. Following the extended inquiry outside the presence of the jury, the trial court announced it would allow Carroll to testify in general terms as to delayed outcries and why they may happen.

When the jury returned, the State continued its direct examination of Carroll. She testified a delayed outcry occurs when an individual reports abuse many months or years after it has happened. Based on her training and experience, she described that children tend to delay outcries due to their fear of being isolated from their family members and fear instilled in them by an aggressor. When asked if a child being related to or living in the same household as their abuser could cause a delayed outcry, she responded:

> Yes. Absolutely. Just in my field I have seen where children have delayed an outcry or delayed telling one adult due to living with the other adult and not wanting to ruin the family household, not wanting to ruin a financial situation or maybe going back into a financial hardship. And those are some of the patterns that we have seen working with different families and children of sexual abuse.

She noted she had listened to children and their parents coming in for services both at the shelter and at the nonresidential facility, and her experience formed her understanding of delayed outcries.

### B. Standard of review and applicable law

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Torres v. State*, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002). We do not reverse the trial court's ruling unless that ruling falls outside the zone of reasonable disagreement. *Id.* In applying the abuse of discretion standard, we may not reverse a trial court's admissibility decision solely because we disagree with it. *See Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001). We will not disturb a trial court's evidentiary ruling if it is correct on any theory of law applicable to that ruling. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

Generally, the trial court may admit a witness's statements as either lay testimony or expert testimony. *See* Tex. R. Evid. 701–02; *Osbourn v. State*, 92 S.W.3d 531, 535 (Tex. Crim. App. 2002) ("Both lay and expert witnesses can offer opinion testimony."). Three requirements must be met before expert testimony can be admitted: "(1) The witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the fact-finder in deciding the case." *Rhomer v. State*, 569 S.W.3d 664, 670 (Tex. Crim. App. 2019). Here, Appellant only questions whether Carroll met the first requirement, that is, whether she was qualified to speak generally on delayed outcries of abused victims.

"Greater qualifications are required for more complex fields of expertise and more conclusive and dispositive opinions." *Id*. "However, in areas where the expert evidence is close to the jury's common understanding, the witness's qualifications are less important than when the evidence is well outside the jury's own experience." *Spitzer v. State*, No. 08-22-00059-CR, 2023 WL 2733363, at *4 (Tex. App.—El Paso Mar. 30, 2023, pet. refused) (mem. op., not designated for publication). A lay witness may testify to matters within her personal knowledge and to

9

opinions or inferences that are "rationally based on the perception of the witness[ ]" and "helpful to a clear understanding the witness['s] testimony or the determination of a fact in issue." *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019) (citing Tex. R. Evid. 701). "[T]he witness's testimony can include opinions, beliefs, or inferences as long as they are drawn from his or her own experiences or observations." *Osbourn*, 92 S.W.3d at 535. This requirement "also incorporates the personal knowledge requirement of Rule 602 which states that a witness may not testify to a matter unless he or she has personal knowledge of the matter." *Id.* (citing *Bigby v. State*, 892 S.W.2d 864, 889 (Tex. Crim. App. 1994)). Based on these principles, the Court of Criminal Appeals has recognized "[t]here is no distinct line between lay opinion and expert opinion." *Rhomer*, 569 S.W.3d at 669.

## C.  Analysis

We conclude the trial court did not abuse its discretion by allowing Carroll to testify generally about delayed outcries by victims. On the record presented, her testimony fell within the realm of a lay opinion predicated on her education, training and experience, and not on a scientific theory that exceeded her qualifications. *Rodgers v. State*, 205 S.W.3d 525, 527–28 (Tex. Crim. App. 2006) ("Because the possible spectrum of education, skill, and training is so wide, a trial court has great discretion in determining whether a witness possesses sufficient qualifications to assist the jury as an expert on a specific topic in a particular case.").

As relevant here, the Court of Criminal Appeals has recognized in a child-sex-abuse case that witnesses may gain specialized knowledge through experience or based on personal research. *Morris v. State*, 361 S.W.3d 649, 656 (Tex. Crim. App. 2011). It noted in *Morris*, for example, that numerous state and federal courts had permitted various types of experts—to include psychiatrists, psychologists, therapists, social workers, and other persons who work in law

10

enforcement—to provide testimony on common behaviors of child molesters, and whether a type of evidence is consistent with a phenomenon known as "grooming," which itself is recognized as including "an attempt by the offender to create a compliant victim." *Id*. at 666–67. The Court determined in that case that grooming exists and that a law enforcement official with significant amount of experience in those cases may be qualified to talk about commonly seen behaviors. *Id*. at 668.

Although Carroll readily admitted that her initial training was in victim advocacy, she nonetheless described that other training included instruction on identifying symptoms of abuse or other signs of an individual experiencing an abusive relationship, in identifying abusive behaviors and toxic patterns, and in identifying "those cries for help from survivors of crime." She described having received training with other professionals including members of the district attorney's offices, law enforcement officers, victim advocates, sexual assault nurses, and forensic nurses. At the CASFV, she supervised a sexual assault response team overseeing sexual assault of both adults and children. Carroll testified she had observed "where children have delayed an outcry or delayed telling one adult due to living with the other adult and not wanting to ruin the family household, not wanting to ruin a financial situation or maybe going back into a financial hardship." She said she listened to children and their parents coming in for services both at the shelter and the nonresidential facility, and her experience listening to children talk about their experiences formed her understanding of delayed outcries.

On this record, then, we determine that Carroll testified within her field of expertise with child-sex-abuse cases and the State did not elicit improper testimony from her. *See Spitzer*, 2023 WL 2733363, at *4 (holding that a sexual assault nurse examiner's testimony was sufficiently

11

tailored to her education, training, and experience). Accordingly, we conclude the trial court did not abuse its discretion by admitting Carroll's testimony.

### D. Any error was harmless

Finally, even if the trial court abused its discretion by admitting Carroll's testimony, any error is harmless. *See* Tex. R. App. P. 44.2(b) (providing that any error not affecting substantial rights must be disregarded). In determining whether Appellant was harmed by the erroneous admission of evidence, we would consider the following: (1) the character of the alleged error and how it might be connected to other evidence; (2) the nature of the evidence supporting the verdict; (3) the existence and degree of additional evidence showing guilt; and (4) whether the State emphasized the complained-of error. *Bagheri v. State*, 119 S.W.3d 755, 762–63 (Tex. Crim. App. 2003)).

As discussed above, the State introduced other evidence supporting Appellant's guilt for the charged offense, including M.M.'s testimony describing the details of the sexual abuse. The State also presented testimony from Maria Chairez, who described that she had observed Appellant grab M.M.'s breast and "jiggle" them as well as apply "a spanking motion" to her buttocks, which she said, "had this vulgar feeling to it." Although Carroll's testimony could be construed to support M.M.'s credibility and an inference of Appellant's guilt, the testimony did not form a critically significant portion of the State's case as she provided no conclusive opinion, but rather, spoke in general terms about delayed outcries of victims. In its closing argument, the State did not rely on Carroll's testimony in arguing Appellant's guilt as it merely mentioned in passing that Appellant slowly manipulated M.M. over time, beginning at a young age. Thus, the record establishes the State did not emphasize the purported error, if any. We conclude that even if there was error in the

admission of Carroll's testimony, it did not affect Appellant's substantial rights or have a substantial and injurious effect on the outcome of the trial. Tex. R. App. P. 44.2(b).

We overrule Appellant's first issue.

### III.  JURY CHARGE ON PUNISHMENT

In his second issue, Appellant asserts the jury charge in the sentencing phase of trial included error. He contends the trial court erred by including an instruction on good conduct credit, urging that he did not qualify for such relief. He argues the charge misled the jury and prejudiced the outcome of the sentencing hearing.

#### A.  The jury instruction

During the charge conference, defense counsel objected to any statement of the law regarding parole or the use of good conduct credit to minimize or lessen Appellant's sentence because he was not eligible for parole. The trial court stated:

> The Court has taken out any language with regard to parole. I agree with you on that. However, it is theoretically possible that he get awarded good conduct time during the time he has been at the county jail and so for that reason your objection is noted. It is overruled.

The charge on punishment given to the jury included the following instruction:

> Under the law applicable in this case, the Defendant, if sentenced to a term of imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts at rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.

> Under the law applicable in this case, the Defendant is not eligible for parole.

> It cannot accurately be predicted how good conduct time might be applied to this Defendant if he is sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison authorities.

You may consider the existence of good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular Defendant.

## B. Applicable law and standard of review

Unless otherwise provided in the Texas Code of Criminal Procedure, "the jury is the exclusive judge of the facts, but it is bound to receive the law from the court and be governed thereby." Tex. Code Crim. Proc. Ann. Art. 36.13. A trial court has the obligation to instruct the jury on "the law applicable to the case." *See* Tex. Code. Crim. Proc. Ann. Art. 36.14 ("[I]n each felony case and in each misdemeanor case tried in a court of record, the judge shall, before the argument begins, deliver to the jury . . . a written charge distinctly setting forth the law applicable to the case[.]").

We analyze a claim of jury-charge error under two steps: we first determine whether the charge is erroneous, and if it is, then we must decide whether the appellant was harmed by the erroneous charge. *Alcoser v. State*, 663 S.W.3d 160, 165 (Tex. Crim. App. 2022). When, as here, there is a timely objection to alleged jury-charge error, the record need only show "some harm" to obtain relief. *Id.* This has been "interpreted . . . to mean that any harm, regardless of degree, is sufficient to require reversal." *Druery v. State*, 225 S.W.3d 491, 504 (Tex. Crim. App. 2007).

## C. Analysis

Article 37.07 § 4(a) mandates the inclusion of the instruction for good conduct time in the punishment charge, and the Court of Criminal Appeals has concluded that although the instruction dictated by the statute may appear to be misleading and inapplicable to some defendants, the statue nonetheless commands that the instruction be given. *See* Tex. Code Crim. Proc. Ann. art. 37.07 § 4(a); *Luquis v. State*, 72 S.W.3d 355, 363 (Tex. Crim. App. 2002) ("The Texas Legislature enacted legislation that requires the trial judge to instruct the jury in the precise wording that the

14

statute recites. Article 37.07, section 4(a) sets out, verbatim, the words that the trial judge is to use. There are even quotation marks around the wording of the instruction."); *Anderson v. State*, No. 08-15-00237-CR, 2016 WL 3007174, at *1 (Tex. App.—El Paso May 25, 2016, pet. ref'd) (mem. op., not designated for publication) (citing to *Luquis* and stating, "issue has been decided firmly against" appellant; concluding, "[w]e are bound by this precedent and therefore conclude the trial court did not err by including the required good-conduct-time instruction even though inapplicable to Appellant").

Appellant relies on three cases when arguing that an instruction on parole eligibility—when a defendant is not eligible for parole—is harmful. However, his reliance is misplaced as each case is factually distinguishable for deviating from required statutory language. *See Arevalo v. State*, 675 S.W.3d 833, 859 (Tex. App.—Eastland 2023, no pet.) (agreeing with appellant "that the trial court erred when it did not include the phrase 'plus any good conduct time' in the parole law instruction"); *Taylor v. State*, 146 S.W.3d 801, 805–06, 813 (Tex. App.—Texarkana 2004, pet. ref'd) (concluding appellant did not demonstrate he suffered egregious harm because instruction that included phrase "he will not become eligible for parole until the actual time served plus any good conduct time earned . . . ." deviated from required statutory language of "he will not become eligible for parole until the actual time served equals one-half of the sentence imposed or 30 years, whichever is less, without consideration of any good conduct time he may earn"); *Washington v. State*, 59 S.W.3d 260, 266–67 (Tex. App.—Texarkana 2001, pet. ref'd) (concluding Article 37.07, § 4(b) instruction was mandatory and trial court had no discretion to ignore the statutory requirement, nor was the instruction misleading as applied to appellant).

In *Luquis v. State*, the Court of Criminal Appeals rejected the same complaint as Appellant advances here. 72 S.W.3d at 363; *see also Wagner v. State*, No. 08-09-00021-CR, 2010 WL

2163845, at *6–7 (Tex. App.—El Paso May 28, 2010, pet. ref'd) (not designated for publication) (concluding court did not err by including the mandated instruction "[a]lthough the instruction may appear to conflict with the court's duty to properly set forth the law applicable to the case, the instruction refers to parole and good conduct time only as possibilities, not certainties[;] the charge included language admonishing the jury not to consider how parole law or good conduct time may apply to Appellant and informed the jury that he may serve his entire sentence without early release."). Accordingly, we conclude the inclusion of the instruction was not error in this instance.

We overrule Appellant's second issue.

## IV. CONCLUSION

We affirm the trial court's judgment.

GINA M. PALAFOX, Justice

January 13, 2025

Before Salas Mendoza, C.J., Palafox and Soto, JJ.

(Do Not Publish)

16